## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ASANTE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-601 (TSC) |
| | ) | |
| ALEX M. AZAR II, Secretary, | ) | |
| U.S. Department of Health and Human | ) | |
| Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are eight hospitals located in Arizona, Nevada, and Oregon.  Compl. ¶ 10, ECF No. 1.  Defendants are the federal agencies and officials responsible for administering Medicaid: the Department of Health and Human Services ("HHS"); former Secretary of HHS, Alex Azar; the Centers for Medicare and Medicaid Services ("CMS"); and former CMS Administrator, Seema Verma.  *Id.* ¶¶ 11–14.  Plaintiffs contend that California's subsidy distribution scheme discriminates against them in violation of the Commerce Clause and the Equal Protection Clause, and that it violates the Administrative Procedure Act ("APA") and the Medicaid Act, specifically 42 U.S.C. § 1396a(a)(16) and its implementing regulation, 42 C.F.R. § 431.52.  *Id.* ¶ 7.

Plaintiffs and Defendants have both moved for summary judgment.  Pls.' Mot. for Summ. J., ECF No. 37; Defs.' Cross Mot. for Summ. J., ECF No. 42.  For the reasons set forth below, the court will **DENY** Plaintiffs' motion and **GRANT** Defendants' motion.

# I.  BACKGROUND

## A.  Factual Background

In 2010, California created the Quality Assurance Fee ("QAF") program, which requires certain California hospitals to pay a QAF, but exempts state public hospitals, small and rural hospitals, long-term care hospitals, and specialty hospitals (except for charitable research hospitals).  ECF No. 37-1 at 14.  The collected fees are matched with federal Medicaid funds and then distributed to California hospitals, including hospitals that are exempt from the QAF.  *Id.* Each year the California Department of Health Care Services ("Department"), pursuant to a state plan amendment ("SPA") approved by CMS, pays California hospitals over $4 billion in federal Medicaid QAF subsidies.  Compl. ¶ 1.  The Department does not, however, pay those subsidies to out-of-state "border hospitals," which are located 55 miles or less from the California border. *Id.*  Border hospitals are critical for enrollees in California's Medicaid program ("Medi-Cal") who live in certain rural areas of California because the border hospitals are sometimes the closest major medical center available to them.  *Id.* ¶ 4.  The border hospitals provide over seventy percent of the inpatient care that California Medi-Cal beneficiaries receive from out-of-state hospitals.  *Id.*

Plaintiffs are border hospitals that provide services to Medi-Cal patients while they are in Arizona, Oregon, or Nevada.  *Id.* ¶ 2.  Plaintiffs are part of a larger group of thirty-seven border hospitals that provide services to Medi-Cal enrollees but that do not receive a portion of the QAF subsidy.

All states participating in the Medicaid program must adopt a state plan and obtain approval of amendments from CMS.  42 U.S.C. §§ 1396a(a), 1396b; ECF No. 37-1 at 10.  The QAF program at issue here covers the period from July 1, 2019, through December 31, 2021.

ECF No. 37-1 at 17.  During that time, Congress expressly delegated to former Secretary Azar the responsibility and authority to administer the Medicaid program and to review state Medicaid plans and plan amendments for compliance with federal law.  Compl. ¶ 14; 42 U.S.C. § 1396a(b) ("The Secretary shall approve any plan which fulfills" the statutory requirements).  Former Secretary Azar delegated to former Administrator Verma and CMS the authority to administer the Medicaid program pursuant to the Social Security Act, 42 U.S.C. §§1396a(13)(A)(iv), 1396r-4(a)(1)(B).  Compl. ¶ 14.

## B.    Procedural Background

Since 2010, out-of-state hospitals have filed several lawsuits attempting to enjoin the QAF program and receive a portion of the subsidy distribution.  *Id.* ¶ 16–17.  Plaintiffs previously settled claims with California regarding the QAF program period from 2009 to June 30, 2019.  *Id.* ¶ 19–29.

Plaintiffs first brought these claims against these Defendants on August 20, 2019, when CMS had not yet approved the 2019 QAF Program.  *See Asante v. Azar*, No. 19-cv-02512-TSC (D.D.C. 2019), ECF No. 1.  Consequently, the court dismissed the action without prejudice because there had been no final agency action.  *See Asante v. Azar*, No. 19-cv-02512 (D.D.C. February 14, 2020), ECF No. 33.  On February 14, 2020, CMS approved the Department's QAF waiver requests for July 1, 2019, to December 31, 2021.  SPA 19-0018 Tax Waiver Approval, 00769, Administrative Record Joint Appendix (A.R.J.A.); SPA 19-0019 Tax Waiver Approval, 00305, A.R.J.A.  On February 25, 2020, Defendants approved California's QAF program for that same program period.  SPA 19-0018 CMS Approval Letter, 00002, A.R.J.A.; SPA 19-0019 CMS Approval Letter, 00002, A.R.J.A.  This approval was a final agency action.

On February 28, 2020, Plaintiffs filed the complaint in this case and moved for a preliminary injunction preventing the federal government from paying approximately $4 billion in supplemental Medicaid funds to California for disbursement to in-state hospitals.  ECF No. 2, Pls.' Mot. for Prelim. Inj.  This court denied Plaintiffs' Motion for Preliminary Injunction because they had not shown that their alleged $15 million loss from California's distribution of all QAF funds constituted irreparable harm.  Mem. Op. Re Pls.' Mot. for Prelim. Inj., ECF No. 32; Order Den. Pls.' Mot. for Prelim. Inj., ECF No. 33.

Plaintiffs—who have not named California as a defendant in this matter—claim California's QAF program is discriminatory because it limits the distribution of federal QAF funds to in-state hospitals, even though both in-state and out-of-state hospitals treat Medi-Cal patients.  ECF No. 37-1 at 17.  They argue that "for the effect of the QAF program to be non-discriminatory, the plaintiff 'border hospitals' should receive the same net QAF benefit as these in-state hospitals." *Id.* at 16.  Plaintiffs contend this discriminatory scheme violates the Commerce Clause, Equal Protection Clause, and the Medicaid Act, and that Defendants' approval and funding of the scheme violate the APA.

## II.  STANDARD OF REVIEW

Ordinarily, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  However, when, as here, the court is reviewing a final agency action under the APA, Rule 56(a)'s standard does not apply.  *See Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012).  Instead of reviewing the record for disputed facts that would preclude summary judgment, the court's role is more limited: "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency

to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quotation marks and citation omitted). This standard of review is "narrow," and a court applying it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). A court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. The APA also requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## III.   ANALYSIS

### A.  Medicaid Act

Plaintiffs claim that HHS, through CMS, approved an SPA allowing California to exclude out-of-state hospitals from its QAF subsidy distribution in violation of a federal statute, 42 U.S.C. § 1396a(a)(16), and its implementing regulation, 42 C.F.R. § 431.52. ECF No. 37-1 at 39–41.

### i.   *Chevron* and *Auer/Kisor* Analysis

In assessing a challenge to an agency action based on a statute, a court must apply the test set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984): "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43.  But "if the statute is silent or ambiguous with respect to the specific issue," then the reviewing court must defer to the agency's interpretation so long as "the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  "If Congress has explicitly left a gap for the agency to fill . . . [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 843–44.

In assessing a challenge to an agency's interpretation of its own regulation, a court must apply the test set forth in *Auer v. Robbins*, 519 U.S. 452, 461 (1997), and clarified in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019): A court defers to an agency's interpretation of its rules only if a regulation is "genuinely ambiguous. . . And before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."  *Kisor*, 139 S. Ct. at 2415 (citing *Chevron*, 467 U.S. at 843, n.9).  "Under *Auer*, as under *Chevron*, the agency's reading must fall within the bounds of reasonable interpretation."  *Kisor*, 139 S. Ct. at 2416 (quotations omitted).

Under 42 U.S.C. § 1396a(a)(16), "a State plan for medical assistance must... provide for inclusion, to the extent required by regulations prescribed by the Secretary, of provisions (conforming to such regulations) with respect to the furnishing of medical assistance under the plan to individuals who are residents of the State but are absent therefrom."  42 U.S.C. § 1396a(a)(16).

42 C.F.R. § 431.52(b) states:

A State plan must provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a beneficiary who is a resident of the State, and any of the following conditions is met:

(1) Medical services are needed because of a medical emergency;

(2) Medical services are needed and the beneficiary's health would be endangered if he were required to travel to his State of residence;

(3) The State determines, on the basis of medical advice, that the needed medical services, or necessary supplementary resources, are more readily available in the other State;

(4) It is general practice for beneficiaries in a particular locality to use medical resources in another State.

Here, Congress left a gap for the agency to fill when it conferred on the Secretary the authority to review and approve state Medicaid plans as a condition for disbursing federal Medicaid payments. *See* 42 U.S.C. §1396b. In carrying out this duty, the Secretary must ensure that each state plan complies with a vast network of specific statutory requirements. *See generally* 42 U.S.C. § 1396a. Congress also delegated to HHS the authority to implement 42 U.S.C. §1396 by issuing rules, and in 1991 HHS amended 42 C.F.R. § 431.52. *See* Medicare and Medicaid Programs; OBRA '87 Conforming Amendments, 56 Fed. Reg. 8832-01 (Mar. 1, 1991). The amendment makes clear that there is a payment requirement in the Medicaid Act, but it is unclear whether payment is owed to healthcare providers or beneficiaries (or both) for coverage of service. Plaintiffs focus on the word "payment" and argue that the "regulation clearly mandates that the State 'will pay' and 'would pay' for services furnished to State residents by out-of-state providers." ECF 37-1 at 41. Defendants argue however, that the statute and regulation's "provisions require only that Medicaid cover out-of-state medical services for beneficiaries to the same extent as it covers in-state services." ECF 42-2 at 17.

The court must consider whether the statute is "genuinely ambiguous," *Kisor*, 139 S. Ct. at 2415, "with respect to the specific issue." *Chevron*, 467 U.S. at 843. Here the specific issue is whether the relevant provisions require a state plan to pay out-of-state providers in a way *that is identical* to the way in-state providers are paid, meaning that in-state and out-of-state hospitals would receive the same base rate for reimbursement, as well as any supplemental payments such as the QAF subsidy.

The Medicaid Act does not guarantee identical payments to providers. Neither 42 U.S.C. § 1396a(a)(16) nor 42 C.F.R. § 431.52 mention "hospitals," "providers," or "health care practitioners," unlike other sections of the Medicaid Act which expressly mention those entities. 42 U.S.C. § 1396a(a)(13), (30), (37). The Secretary chose an interpretation consistent with the literal meaning of § 1396a(a)(16) and 42 C.F.R. § 431.52, and that interpretation falls "within the bounds of reasonable interpretation" under both *Auer* and *Chevron*. *Kisor*, 139 S. Ct. at 2416. Bearing in mind the Supreme Court's admonition that "deference in accordance with *Chevron*… is warranted only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," *Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006) (quotations omitted), the court will defer to the agency's interpretation of the Medicaid Act, and therefore finds that the QAF program does not violate the Act.

## B.  APA

Plaintiffs claim that in allowing the California SPAs to exclude the border hospitals from the QAF subsidy distribution, Defendants violate the Commerce Clause, the Equal Protection Clause, and the Medicaid Act. ECF No. 37-1 at 27. Plaintiffs urge the court to set aside Defendants' decision because it is "arbitrary, capricious, an abuse of discretion," "otherwise not

8

in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." ECF No. 37-1 at 11.

### i.  <u>Arbitrary and Capricious</u>

In assessing an arbitrary and capricious challenge to agency action, the court's review must be "highly deferential" and begins with a presumption that the agency's actions are valid. *Env't. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  A court exercising its narrowly defined duty under the APA must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, and whether the agency based its decision on facts in the record and relevant factors.  *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Pro. Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220 (D.C. Cir. 1983); *see also Spadone v. McHugh*, 864 F. Supp. 2d 181, 187 (D.D.C. 2012) (citation omitted) ("A decision is arbitrary or capricious under the APA if an agency failed to provide a reasoned explanation, failed to address reasonable arguments, or failed to consider an important aspect of the case.").

Under Section 706(2)(A) of the APA, Plaintiffs "bear[] the burden of establishing the invalidity of the agency's action."  *Magneson v. Mabus*, 85 F. Supp. 3d 221, 225 (D.D.C. 2015). Plaintiffs have not met this burden because they have not shown that Defendants failed to adequately explain their decision, base their decision on facts in the record, or consider relevant factors.  ECF No. 37-1 at 11, 53.

In approving California's SPAs, CMS noted that it had weighed, among other considerations, the relevant provisions of the Medicaid Act and California's policy goals.  SPA 19-0018 CMS Approval Letter, 00004, A.R.J.A.; SPA 19-0019 CMS Approval Letter, 00004,

A.R.J.A.  The agency even considered the arguments Plaintiffs made in *Asante v. Azar*, 19-2512 (D.D.C. 2019).  *See* SPA 19-0018 CMS Approval Letter, 00003, A.R.J.A.; SPA 19-0019 CMS Approval Letter, 00003, A.R.J.A.  CMS's SPA approval letters noted that it "gave additional consideration to the state's exclusion of out-of-state hospitals and asked the state to further explain its policy goal with this program and its compliance with the Medicaid statue as well as the Constitution's Commerce Clause and Equal Protection Clause," before ultimately finding that the SPAs were consistent with the relevant Medicaid Act statutes.  *Id.*  Moreover, the administrative record indicates that CMS corresponded frequently with California before approving both SPAs.  Certified List of Administrative Record Contents for SPA 19-0018, ECF No. 36-1; Certified List of Administrative Record Contents for SPA 19-0019, ECF No. 36-2. For example, before CMS approved SPA 19-0018 on February 25, 2022, CMS and California corresponded before the plan was submitted, again regarding preliminary review questions, and on three separate occasions regarding requests for additional information.  ECF No. 36-1.  CMS and California corresponded with the same frequency before CMS approved SPA 19-0019, which was approved on the same day as SPA 19-0018.  ECF No. 36-2.  The Administrative Record therefore shows that Defendants considered the fact that out-of-state hospitals were excluded from the subsidy and considered California's as well as Plaintiffs' positions before approving the SPAs.  Consequently, Plaintiffs have not shown that Defendants' actions were arbitrary and capricious under Section 706(2)(A).

### ii.  Contrary to Constitutional Right

Apart from the power of review granted by the APA, the court "has the authority to examine and rule on any actions of a federal agency that allegedly violate the Constitution." *Rydeen v. Quigg*, 748 F. Supp. 900, 905 (D.D.C. 1990), aff'd mem., 937 F.2d 623 (Fed. Cir.

1991) (citing *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979)).  But the APA "also

provides for the Courts to make an independent assessment of constitutional issues," and the

court's role is the same "whether the plaintiff sues directly under the Constitution or under [the

APA]."  *Id.* at 905 n.8 (citing 5 U.S.C. § 706(2)(B)).

## 1.   Commerce Clause

Plaintiffs claim that HHS, through CMS, approved an SPA that allows California to

exclude out-of-state hospitals from its QAF subsidy distribution in violation of the Commerce

Clause.  ECF No. 37-1 at 17.  The Commerce Clause grants Congress power to "regulate

Commerce ... among the several States."  U.S. CONST. art. I, § 8, cl. 3.  Although the Clause is

framed as a positive grant of power to Congress, courts have consistently held that the Clause

contains a further, negative command, known as the dormant Commerce Clause, limiting the

power of the states to discriminate against interstate commerce.  *See New Energy Co. v.

Limbach*, 486 U.S. 269, 273 (1988) ("This 'negative' aspect of the Commerce Clause prohibits

economic protectionism-that is, regulatory measures designed to benefit in-state economic

interests by burdening out-of-state competitors.").  Two exceptions can save state regulations

that would otherwise be unconstitutional under the dormant Commerce Clause: congressional

consent and state action that qualifies as market participation.  *See* 15 Bus. & Com. Litig. Fed.

Cts. § 163:36 (5th ed.).

## 1(a).   Congressional Consent

"Dormant Commerce Clause restrictions apply only when Congress has not exercised its

Commerce Clause power to regulate the matter at issue."  *Tennessee Wine & Spirits Retailers

Ass'n v. Thomas*, 139 S. Ct. 2449, 2465 (2019).  Congress "may use its powers under the

Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate

commerce that they would not otherwise enjoy.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1983) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980)). The congressional directive exempting a state statute from Commerce Clause scrutiny must be "unmistakably clear." *See Maine v. Taylor*, 477 U.S. 131, 139 (1986).

Defendants argue that dormant Commerce Clause restrictions do not reach the QAF distribution scheme because Congress expressly delegated to the HHS Secretary—who delegated to the CMS Administrator—the responsibility and authority to administer the Medicaid program and to review California's Medicaid plans and plan amendments. *See* ECF No. 42-2 at 33. But federal agency approval does not eliminate an alleged constitutional defect. *See Pharm. Rsch. & Mfrs. Am. v. Thompson*, 259 F. Supp. 2d 39, 82 n.28 (D.D.C. 2003) ("Although Congress authorized the Secretary to approve state Medicaid plans, it did not unmistakably delegate to him the ability to authorize state programs that violate the Commerce Clause"), aff'd sub nom. *Pharm. Rsch. & Mfrs. Am. v. Thompson*, 362 F.3d 817, 827 (D.C. Cir. 2004); *see also Mary Hitchcock Mem'l Hosp. v. Cohen*, No. 15-cv-453-LM, 2016 WL 1735818, at *4 (D.N.H. May 2, 2016) (holding that state Medicaid programs are not exempt from Commerce Clause scrutiny). In *Western and Southern Life Insurance Co. v. State Board of Equalization of California*, 451 U.S. 648, 653 (1981), the Supreme Court found that a state law imposing a discriminatory and retaliatory tax on out-of-state insurance companies did not violate the Commerce Clause because the McCarren-Ferguson Act (15 U.S.C. § 1012(a)) removed any Commerce Clause restrictions on a state's power to tax the insurance business. ("Section 2(a), 59 Stat. 33, 15 U.S.C. § 1012(a), declares: 'The business of insurance ... shall be subject to the laws of the several States which relate to the regulation or taxation of such business.' The unequivocal language of the Act suggests no exceptions."). In *Pharmaceutical Research & Manufacturers of America,* the D.C.

Circuit held that a state's HHS-approved prescription drug program that had the practical effect of controlling out-of-state drug prices did not violate the Commerce Clause because a federal statute—not the state program itself—specifically required interstate price conformity. 362 F.3d at 827.

Here, CMS approved the waiver allowing California to exclude out-of-state hospitals from their QAF subsidy distribution, but the federal statute authorizing the program did not expressly direct the state to pay only in-state hospitals. *See* 42 U.S.C. Section 1396a(a)(16); 42 C.F.R. § 431.52. Consequently, the congressional consent exemption does not apply.

### 1(b).   Market Participation

When a state acts as a market participant, rather than a market regulator, its decisions are exempt from dormant Commerce Clause challenge. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (exempting from the Commerce Clause states that go beyond regulation and participate in the market so as to exercise the right to favor their own citizens over others.). A state acts as a participant rather than a regulator when it buys, sells, or directly pays for something in the market rather than taxes something in the market. *See* Dan T. Coenen, *Untangling the Market–Participant Exemption to the Dormant Commerce Clause*, 88 MICH. L. REV. 395, 422 (1989) ("When a state government regulates or taxes, it turns over nothing that belongs to it; rather, it compels private action through the exercise of raw governmental power. In contrast, when a state government buys or sells, it is controlling and distributing its own resources.").

Relying on *Asante v. California Department of Health Care Services*, 886 F.3d 795, 800 (9th Cir. 2018), Defendants note that the plaintiffs in that case are the same Plaintiffs here, and that "the Ninth Circuit has already found that California is acting as a market participant when

determining Medicaid payment rates."  ECF No. 42-2 at 36.  But *Asante v. California Department of Health Care Services* challenged reimbursement to out-of-state hospitals for Medicaid base rates, whereas this case challenges supplemental payments.  886 F.3d at 801 ("Here the Department sets rates of reimbursement to hospitals for those who are essentially insured as beneficiaries under Medi-Cal in a manner much like that of a private insurer participating in the market").  The QAF program involves "supplemental payments to hospitals that are separate from and in addition to Medicaid payments for services rendered," i.e., base payments.  Compl. ¶ 63.  In other words, the QAF program is a type of subsidy to California hospitals.

The Supreme Court has found that state action having the purpose and/or effect of providing a subsidy is a form of state regulation, not market participation.  *See New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 277 (1988) ("the tax credit scheme has the purpose and effect of subsidizing a particular industry… That does not transform it into a form of state participation in the free market).  The Court has suggested that a pure or direct subsidy by a state or local government is generally permissible under the Commerce Clause.  *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 590–91 (1997).  In *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994), the Court held that a pricing program consisting of a subsidy and a nondiscriminatory tax on all dairy farmers violated the dormant Commerce Clause because the tax was effectively imposed only on out-of-state dairy farmers.  It noted that a "pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business."  *Id.* at 199.  In *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988), the Court explained that "[t]he Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only

action of that description in connection with the State's regulation of interstate commerce.
Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition."
(emphasis omitted).

This case does not involve a pure subsidy funded by general revenue. QAF payments are
akin to disproportionate share hospital (DSH) payments in that they both operate like a subsidy,
using hospital dollars to obtain federal matching funds, and then returning the hospital dollars
along with the federal monies to the hospitals. *West Virginia University Hospitals, Inc. v.
Rendell,* No. 1:CV–06–0082, 2007 WL 3274409, at *9 (M.D. Pa. Nov. 5, 2007), involved a state
Medicaid program that provided "trauma disproportionate share hospital" payments solely to in-
state hospitals that treated large numbers of Medicaid and low-income patients. There, the court
held that the state did not "fall within the market participant exception to the dormant Commerce
Clause." *Id.* at *9. The court reasoned that "as a component of Pennsylvania's State Plan for
Medicaid, the Trauma DSH payments are jointly funded by Pennsylvania and the federal
government." *Id.* As in *Rendell*, the challenged subsidy here involves a mix of state and federal
funds. Therefore, the market participation exemption does not apply, and the court must analyze
whether the QAF program violates the dormant Commerce Clause.

### 1(c).   Dormant Commerce Clause Analysis

In evaluating a regulation under the dormant Commerce Clause, a court must first ask
whether the regulation "directly regulates" or "discriminates against interstate commerce," or has
the "effect ... [of] favor[ing] in-state economic interests over out-of-state interests." *Thompson*,
259 F. Supp. 2d at 80. If there is a direct effect, "then the [regulation] (and the Secretary's
approval of it) must be struck down without further inquiry." *Id.* Proof of discriminatory impact
is sufficient for a facially neutral law to be deemed discriminatory. *See Hunt v. Wash. State*

*Apple Advert. Comm'n*, 432 U.S. 333, 352–53 (1977) (holding invalid state statute prohibiting display of state-specific apple grades on containers shipped into the state because of discriminatory impact on interstate commerce); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994) (holding invalid town ordinance requiring solid waste processed or handled within town be processed or handled at town's transfer station because of discriminatory impact on interstate commerce).

A facially neutral law is not discriminatory if it "does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978) (finding state statute barring producers or refiners of petroleum products from operating retail service stations within Maryland nondiscriminatory because it had no impact on the relative proportions of local and out-of-state goods sold in Maryland, and had no demonstrable effect on interstate flow of goods); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472 (1981) (finding state statute prohibiting milk retailers from selling their products in plastic containers nondiscriminatory because it allowed milk to continue to move freely across the Minnesota border); *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154-55 (9th Cir. 2012) (finding state statute prohibiting licensed opticians and optical companies from offering and advertising eyewear and eye examinations at same location nondiscriminatory because it did not interfere with the flow of eyewear into California).

In *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), a cantaloupe grower successfully challenged the constitutionality of an Arizona statute prohibiting the transport of uncrated cantaloupes from Arizona to California for packing and processing.  The Supreme Court explained the general rule: "Where the statue regulates even-handedly to effectuate a legitimate

16

local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142. Courts applying the *Pike* test must first "examine[] whether the State's interest is legitimate" and then determine "whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (citing *Pike*, 397 U.S. at 142). State laws frequently survive the *Pike* test. *See, e.g.*, *United Haulers Ass'n. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346–47 (2007) (applying *Pike* and upholding "flow control" ordinances requiring private haulers to obtain permits to collect solid waste and deliver it to the state-created authority for processing because incidental burden on interstate commerce did not exceed environmental public benefits); *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 525–26 (1989) (applying *Pike* and upholding state regulation providing that producers' entitlements to certain quantities of natural gas would be permanently cancelled if production were substantially delayed, because incidental burden on interstate commerce did not exceed environmental public benefit). The *Pike* balancing test gives courts "enormous discretion because there is no formula or standard for how to compare the burdens on interstate commerce with the benefits of the state or local government; indeed the court is comparing two very different things." Erwin Chemerinsky, Constitutional Law: Principles and Policies, 480, Sixth Edition (2019).

For example, in *Minnesota v. Clover Leaf Creamery Co.*, in upholding a statute banning the sale of milk in plastic containers, the Court first found that the state's interest in environmental protection and conservation was legitimate and not "simple protectionism." 449 U.S. at 471. Further, it found that the burden on interstate commerce was not clearly excessive

because plastic manufacturers could produce other products and the interstate market was not significantly impacted.  *Id.* at 472-74.

Here, the QAF program does not directly regulate or discriminate against interstate commerce because it does not tax out-of-state hospitals, require out-of-state hospitals to participate, or change the base payments out-of-state hospital receive for providing Medi-Cal services.  The QAF program has only an indirect or incidental effect on interstate commerce because the border hospitals that treat California Medi-Cal patients will not receive the QAF subsidy that California hospitals receive.  Accordingly, the program must be analyzed under the *Pike* test.

Applying the first part of the *Pike* test—whether the state's interest is legitimate— California's stated goals for the QAF program are to: 1) improve access to health care for some of the state's most vulnerable residents, 2) improve reimbursement and secure additional federal funds for those hospitals essential to maintaining the Medi-Cal safety net, 3) provide funding for healthcare coverage for low income children in California, and 4) target those private hospitals in California that are most likely to serve a significant volume of Medi-Cal beneficiaries and are therefore integral to maintaining Medi-Cal access.  *See* SPA 19-0018 CMS Approval Letter, 00004, A.R.J.A.; SPA 19-0019 CMS Approval Letter, 00004, A.R.J.A.  Like the environmental interest in the plastic ban in *Minnesota v. Clover Leaf Creamery Co.*, California's stated goals are legitimate and not simply protectionist.

In applying part two of the *Pike* Test—whether the burden on interstate commerce exceeds the local benefits—Plaintiffs have not established that there *is* a burden on interstate commerce.  Plaintiffs do not claim that if they do not receive the QAF subsidy, their Medi-Cal patients will be unable to access care, nor that the quality of care will diminish, or even that they

will lose funding.  According to CMS, border hospitals will continue to treat Medi-Cal patients, will continue to receive base payments, and will not operate at a loss.  *See* SPA 19-0018 - SPA Will Not Trigger Access Rule, 00766, A.R.J.A. (CMS email to DHS confirming SPAs "will not diminish access to care for Medi-Cal beneficiaries or decrease rates for hospitals servicing Medi-Cal beneficiaries"); SPA 19-0018 CMS Approval Letter, 00003, A.R.J.A. (CMS found "no indication or argument raised that the current Medi-Cal payment rates for out-of-state services are insufficient to ensure access of out-of-state Medicaid services to California Medi-Cal beneficiaries."); Compl. ¶ 63 ("supplemental payments…shall not affect any other payments to hospitals).  Consequently, under the *Pike* test, the QAF program does not create a burden on interstate commerce that clearly exceeds the local benefits and therefore does not violate the dormant Commerce Clause.

### 2.      Equal Protection Clause

Plaintiffs claim that the QAF Program violates the Equal Protection Clause of the Fourteenth Amendment, which prohibits a state from denying "any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Equal Protection Clause applies to the federal government through the Due Process Clause of the Fifth Amendment.  *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).  Thus, the "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."  *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

To succeed on an equal protection claim, a plaintiff must "demonstrate that he was treated differently than similarly situated individuals and that the [government's] explanation does not satisfy the relevant level of scrutiny."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.C. Cir. 2005).  Where, as here, an equal protection claim does not involve a suspect

class, the court applies rational basis scrutiny.  *See FCC v. Beach Commc'ns., Inc.*, 508 U.S. 307, 313 (1993) (noting that government actions "must be upheld against equal protection challenge if any reasonably conceivable state of facts could provide a rational basis for the classification"). "Review of an equal protection claim in the context of agency action is similar to that under the APA ... [that is,] the only question is whether ... treatment of [the plaintiff] was rational (i.e., not arbitrary and capricious)."  *Nazareth Hosp. v. Sec'y. U.S. Dep't of Health and Hum. Servs.*, 747 F.3d 172, 180 (3d Cir. 2014); *see also Cooper Hosp./Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016).  The Supreme Court has cautioned that where there are "plausible reasons" for Congress' action, "our inquiry is at an end."  *Beach Commc'ns, Inc.*, 508 U.S. at 313–14 (citations omitted).

Two courts considering equal protection challenges to Medicaid plans found that reimbursing out-of-state hospitals for Medicaid care at a lower base rate than in-state hospitals violated the Equal Protection Clause.  *See W. Va. Univ. Hosps., Inc. v. Casey*, 701 F. Supp. 496, 520 (M.D. Pa. 1988), *rev'd in part on other grounds* by 885 F.2d 11 (3d Cir. 1989), *rev'd in part on other grounds by* 499 U.S. 83 (1991); *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 771 (Cal. Ct. App. 2002).  Another court found that distributing trauma DSH payments solely to in-state hospitals violated the Equal Protection Clause.  *Rendell*, No. 1:CV–06–0082, 2007 WL 3274409, at *8.  But these decisions are inapplicable here because none involve a supplemental payment based on a provider tax.

In *Rendell*, the court held that a border hospital was similarly situated to in-state hospitals and that the state's proffered justification—improvement of access to trauma care for Pennsylvania residents—was not rationally related to denying the trauma DSH payment to out-of-state hospitals.  *Id.*  Notably, none of the hospitals in *Rendell*—in-state or out-of-state—paid a

fee connected to the trauma DSH payments.  While the QAF and DSH programs here are similar, the QAF program obtains matching funds through fees, whereas DSH programs, like the one in *Rendell,* obtain matching funds through intergovernmental transfers.  Compl. ¶ 64.  Plaintiffs are not similarly situated to the California hospitals receiving the QAF subsidy because they do not pay the QAF fee.  SPA 19-0018 CMS Approval Letter, 00005, A.R.J.A.

Plaintiffs point out that paying the QAF fee is not a prerequisite for receiving a QAF subsidy, as forty "non-designated public hospitals" and twenty-six "designated public hospitals" in California receive QAF funds but are exempt from QAF fees.  Pls.' Statement of Facts, ECF No. 37-2 at 3.  Plaintiffs claim that they are similarly situated to those hospitals, ECF No. 37-1 at 37, but the California hospitals that are exempt from the QAF fees and receive the subsidy are "small and rural hospitals."  SPA 19-0018 CMS Approval Letter, 00005, A.R.J.A.  In its review process, CMS considered whether border hospitals should receive the QAF subsidy and concluded that they would be "not likely to meet th[e] definition" of "small and rural hospitals as defined in Section 124840 of the California Health and Safety Code" "even if they were in fact located in California."  *Id.*  Consequently, Plaintiffs are not similarly situated to the California hospitals receiving the QAF subsidy without paying the fee because they would not meet the standard for exemption even if they were in the state.

Defendants also provided a rational basis for deciding to exclude out-of-state hospitals from the QAF program.  The Department found it "reasonable for the California Legislature to prioritize in-state private hospitals for receipt of supplemental payments based on where the bulk of utilization is taking place and for purposes of a specialized revenue source."  SPA 19-0018 Asante Answers, 00549, A.R.J.A.  Indeed, although Plaintiffs emphasized the number of Medi-Cal patients they serve, they did not indicate how that number compared to the overall Medi-Cal

population.  In contrast, the Department found that "border hospital utilization by Medi-Cal

beneficiaries is still relatively de minimis compared to in-state private hospital utilization." *Id.*

Given that the border hospitals and the in-state hospitals are not similarly situated, and the

Department provided a rational basis for the QAF program, the program does not violate the

Equal Protection Clause.

## IV.   CONCLUSION

For the reasons set forth above, the court will **DENY** Plaintiffs' Motion for Summary

Judgment and **GRANT** Defendants' Cross Motion for Summary Judgment.


Date:  February 14, 2023


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge